GORDON MANNWEILER ET AL. *v.* CHARLES
LAFLAMME ET AL.
(AC 15265)

Lavery, Schaller and Hennessy, Js.

Argued January 21—officially released September 2, 1997

*Edward G. Fitzpatrick,* with whom, on the brief, was *Jayne Elser Welch,* for the appellants (plaintiffs).

*Vincent T. McManus, Jr.,* for the appellees (defendants).

*Opinion*

LAVERY, J. The plaintiffs appeal from the judgment rendered for the defendants on the plaintiffs' complaint seeking a permanent injunction to enforce a restrictive covenant to prevent the defendants from constructing more than one house on a lot. The dispositive issue is whether all of the lots in the subject development, including those of the plaintiffs and the defendants, were subject to restrictive covenants that prevented any owner from subdividing an existing lot and creating additional building lots.

The following facts are necessary for the resolution of this appeal. In 1927, the J. H. Whittemore Company

(Whittemore) recorded a subdivision map of a tract of land known as the Hop Brook Development (Hop Brook) in the Naugatuck land records. Hop Brook consisted of six sections that were divided into fifty-two lots that were delineated on the subdivision map. The lots were not of equal size. All the parties to this action are owners of property in the development and derive their title from Whittemore, who was the common grantor. In May, 1991, the defendants received approval from the Naugatuck planning and zoning commission to resubdivide their property and to construct two houses, in addition to the house that presently exists, on their lot.

The plaintiffs instituted this action seeking injunctive and declaratory relief to prevent the defendants from constructing the two additional dwellings on their resubdivided parcel. The plaintiffs claim that Whittemore had created, by restrictive covenant, a uniform plan of development, or common scheme. The plaintiffs contend that this common scheme limits any development within Hop Brook to one residential dwelling per lot, as it is shown on the map to which all subsequent conveyances were subject.

In September, 1927, the first deed conveying a lot from Hop Brook, which was delivered to Howard Bristol, contained the following restrictive covenants: "This conveyance is made subject to the following covenants and restrictions and the said Grantee, his heirs and assigns, by the acceptance of this deed, assents and agrees to take the said premises subject thereto: 1. The aforesaid premises shall be occupied and used by the Grantee, his heirs and assigns, for private residential purposes only and not otherwise, and *there shall at no time be erected or maintained thereon anything except one private residence for the use of one family only,* which private residence shall cost, exclusive of the land

not less than $15,000, together with the necessary out-buildings appurtenant thereto. . . . 3. *Each and all the foregoing covenants and restrictions are for the mutual benefit of all persons who have derived or who shall derive title, directly or indirectly from the Grantor to any lot or lots shown on the Map hereinbefore referred to, and shall run with the land in favor of all lots shown on said Map, and any breach or threatened breach of any one or more or all of the covenants and restrictions aforesaid may be enjoined upon application of the Grantor, its successors and assigns, or any person or persons who have derived or shall derive title directly or indirectly from the Grantor to any lot or lots shown on said map.*" (Emphasis added.)[1] Whittemore subsequently conveyed thirty of the fifty-two lots to grantees within Hop Brook from 1927 until 1937. All of those deeds contained covenants and restrictions that were virtually identical to those set forth above.

In December, 1934, Whittemore and all prior grantees signed and recorded a written modification of the covenants and restrictions changing the minimum cost of construction of a private residence from $15,000 to $10,000 on twenty-two of the lots in Hop Brook. The modified language states: "1. The aforesaid premises shall be occupied and used by the Grantee, his heirs, and assigns, for private residential purposes only and not otherwise, and there shall at no time be erected or maintained thereon anything except one private residence for the use of one family only, which private residence shall cost, exclusive of land, not less than $10,000.00, together with the necessary outbuilding

---

[1] One of the plaintiffs, Gordon Mannweiler, is the owner of three lots in Hop Brook and is a successor in interest to Franklin Bristol, who took title to said lots in August, 1930, from Whittemore. The other plaintiff, William Boies, owns two lots in Hop Brook and also derives his title from Whittemore, with his wife first acquiring title in 1936. The aforementioned covenants and restrictions were placed in the deeds of both plaintiffs.

thereto . . . and said lots are hereby released and discharged from any restriction now existing whereby a private residence thereon shall cost more than said sum. Said covenant and restriction shall be for the mutual benefit of all persons who have or shall have title to any lot or lots shown on the Map of said Hop Brook Development, and shall run with the land in favor of all lots shown on said map and any breach or threatened breach thereof may be enjoined upon this application of the Party of the First part, its successors and assigns, or any person or persons who have derived or shall derive title, directly or indirectly, from the Party of the First Part to any lot or lots shown on said Map."

In September, 1936, the common grantor, Whittemore, and all prior grantees of Hop Brook, including mortgage holders, agreed to a correction in a deed dated November, 1927, to Helen W. Adams. That deed described the property conveyed to her as one parcel, section D, lots one through seven. The agreement provided that the lots, then owned by Martin L. Martus, consisted of seven separate building lots as set forth in the development map. The pertinent language in the agreement states: "The aforesaid premises shall be occupied and used by the Grantee, his heirs and assigns, for private residential purposes only and not otherwise, and there shall at no time be erected or maintained upon any one lot of the seven lots comprising said aforesaid premises and shown and described on said Map entitled 'Lot Plan of Hop Brook Development,' anything except one private residence for the use of one family only, which private residence shall cost, exclusive of the land, not less than $15,000.00, together with the necessary outbuildings appurtenant thereto which said covenant and restriction shall operate to the same purpose and effect as though it had been contained in said deed from J. H. Whittemore Company to Helen W. Adams." The common grantor, Whittemore,

did not reserve any right to revoke, to amend, or to alter any of the restrictive covenants in the deeds of the first thirty-two lots it conveyed out of Hop Brook.

In August, 1937, Whittemore conveyed section E of Hop Brook to Lewis A. Dibble.[2] Whittemore conveyed that land to Dibble with the covenants and restrictions as set out in the prior conveyances of Hop Brook lots, but with an additional paragraph. That paragraph states: "4. It is particularly agreed and understood that should the Grantee, his heirs or assigns, purchase further lands from the Grantor, or its successors, within Block 'E,' as shown on said Map, the foregoing covenants and restrictions may be revoked, in whole or in part, and others substituted therefor, by an agreement entered into by and between the Grantor, or its successors, and the Grantee, or his heirs or assigns, alone, and without the consent of any other person or persons."

After August, 1937, Whittemore conveyed several lots containing the original covenants and restrictions, but without a unilateral right to modify. Dibble had previously purchased lot two of section E from Whittemore in 1927, as well as a portion of lot three in 1930, which was adjacent to lot two. In the conveyance of the portion of lot three from Whittemore to Dibble, the following pertinent covenants and restrictions were put into the deed. "1) The aforesaid premises shall be occupied and used by the Grantee, his heirs and assigns, for private residential purposes only, and not otherwise, in connection with and as part of Lot No. 2 as shown on said Map, heretofore conveyed by the Grantor to the Grantee herein. 2) No house or outbuilding, including garage, stable, or any other structure, or any part or portion thereof, including porches, steps, porte cocheres, bay windows and any and all projections therefrom shall be at any time erected or placed on or over

---

[2] Dibble is a predecessor in title to the defendants' portion of the section one and five lots.

the within described premises. 3) Each and all the foregoing covenants and restrictions are for the mutual benefit of all persons who have derived or who shall derive title, directly or indirectly, from the Grantor to any lot or lots shown on said Map.

"The Grantee, by the acceptance of this deed, covenants and agrees that this conveyance shall not be deemed a violation of the covenants of the Grantor contained in a certain deed from the Grantor to the Grantee dated September 30, 1927, and recorded in Naugatuck Land Records, Volume 78, pages 41–42, said covenants relating to certain restrictions as to the sale and use of Lot No. 3, as shown on said Map, and it is agreed and understood that said covenants of the Grantor in said deed contained shall hereafter relate to and restrict the Grantor only as to the remaining portion of said Lot No. 3, so that the same shall read as follows: The Grantor covenants and agrees that it will, itself, sell the adjacent parcel to the north, shown as the remaining portion of Lot No. 3 on said Map, only as one parcel." The conveyance of the portion of lot three made lot two larger but did not create an additional building lot. The remainder of lot three was to be a building lot.

In September, 1946, Whittemore conveyed to Dibble, the defendants' predecessor in title, all of the remaining land of section E that had not been previously conveyed to Dibble. This land consisted of the remaining portions of lots one, five and three, as well as lot four in its entirety. The deed conveying this property contained the following language: "In accordance with and to the extent that power to do so has heretofore been reserved by the Grantor, all covenants and restrictions applicable to lands within said Section E heretofore purchased by the Grantee from the Grantor are hereby revoked. In place thereof, and as applicable to all premises located within said Section E, whether heretofore or hereunder acquired, the said Grantee, his heirs and assigns, by the

acceptance of this deed, assents and agrees that the premises within said Section E heretofore acquired by the Grantee shall be subject to the following covenants and restrictions: 1. All said premises shall be occupied and used by the Grantee, his heirs and assigns, for private residential purposes only and not otherwise, and there shall at no time be erected or maintained thereon anything except private residences, each for the use of one family only, which private residences shall each cost, exclusive of land, not less than $15,000.00, together with the necessary outbuildings thereto, and except such outbuildings as may be desired by the Grantee, his heirs and assigns, for use in connection with the occupancy of a private residence located within said Section. No private residence shall be erected or maintained on a lot having a street frontage of less than 100 feet or a total area of less than 15,000 square feet. 2. Said premises may be re-subdivided into building lots of dimensions other than those shown on said Map, provided, however, that no lot shall have a street frontage of less than 100 feet nor a total area of less than 15,000 square feet. On any such lot, or on the original lots if not re-subdivided, no house or outbuildings, including garage, stable, or any other structure, or any part or portion thereof, including porches, steps, porte cochere, bay windows, and any and all projections therefrom, shall be at any time erected or placed nearer to the front or sidewalk lines of any such lot than forty feet, nor nearer to the side line of any such lot than twenty feet or, where such lot sides upon a street, nearer than forty feet to such side or sidewalk line. 3. Each and all the foregoing covenants and restrictions are for the mutual benefit of all persons who have derived or who shall derive title, directly or indirectly, from the Grantor to any lot or lots shown on the Map herein before referred to, and shall run with the land in favor of all lots shown on said Map, and any breach or threatened breach of any one or more or all of the covenants

and restrictions aforesaid may be enjoined upon the application of the Grantor, its successors and assigns, or any person or persons who have derived or shall derive title, directly or indirectly, from the Grantor to any lot or lots shown on said Map."

Language expressly permitting subdivision is contained in the original deed of conveyance in twenty-two of the fifty-two lots in the subdivision. Those twenty-two lots were conveyed subsequent to the conveyance of the first thirty lots, which contained no such language. Until the defendants' resubdivision, no lots existed other than those shown on the original subdivision map. While some boundary lines have been changed, no new lots have been created and some houses have been built on more than one lot by combining two or more lots. The lots in section E are substantially larger than the other lots in Hop Brook and may be resubdivided under the subdivision regulations of Naugatuck, as was done in lot one in this case.

The defendants took title to lots one, two, five and a portion of lot three, section E, of Hop Brook in June, 1989. The defendants accepted title subject to the following language: "Possible conditions and restriction as set forth in two Warranty Deeds from J. H. Whittemore Company to Louis A. Dibble dated September 30, 1927 and July 15, 1930 recorded respectively in Vol. 78 Pages 41 and 642 of the deed from J.H. Whittemore Company to Louis A. Dibble dated September 26, Land Records, as supplemented by a Warranty Deed between those parties dated September 26, 1946 recorded December 7, 1946 in Vol. 97, Page 493 of the Naugatuck Land Records." The defendants have erected one single-family dwelling on lot one, section E, of the subdivision.

The plaintiffs claim that the construction of additional dwellings on lot one of section E is in violation of the mutual restrictive covenants as set forth in deeds

to their lots, and those of their predecessors in title. The plaintiffs sought a temporary injunction to prevent the construction of the additional dwellings. The temporary injunction was granted by the trial court. The trial court, however, subsequently denied the plaintiffs' request for a permanent injunction. The trial court found that a common plan existed to develop a residential area of single-family homes, but that it was not part of the general plan or scheme to restrict the subdivision of the defendants' lots except as described in the defendants' deed. The trial court relied on *Whitton* v. *Clark,* 112 Conn. 28, 151 A. 305 (1930), and concluded: "[T]he only restriction that is common to all deeds out of the common grantor is the restriction to construct single family homes of a certain value with a certain minimum lot size. Not common to all deeds, just as in *Whitton,* is any further limit, such as a restriction on subdividing larger lots to the minimum size requirements imposed by the deed to the lot being subdivided.

"There is no restriction on subdivision in any common deed to which all deeds relevant to this matter may be traced. In fact there is no evidence of any common deed, only evidence regarding a common grantor whom we know changed the restrictions in his deeds over time from those that are silent on the issue of subdivision to those that expressly permit it."

The trial court found it unnecessary to rule on the defendant's special defense that they were entitled to judgment in this case pursuant to the provisions of the Marketable Title Act[3] due to the failure of the plaintiffs to preserve their claim, as required by General Statutes § 47-33b, by filing a notice in the defendants' chain of title within the forty year period specified by the act. The plaintiffs now bring this appeal.

---

[3] General Statutes § 47-33b et seq.

On appeal, the plaintiffs claim that the trial court was incorrect (1) in finding that, although a common scheme of development exists, the language of the restrictive covenant—"one private residence for the use of one family only"—does not constitute an enforceable restriction on the number of dwellings that may be constructed on any one lot as set forth in the 1927 lot plan of Hop Brook recorded in the Naugatuck land records, (2) in not declaring that the attempted reservation of the right to revoke the restrictive covenants by the original grantor in 1937, and the actual revocation in 1946 without the consent of the prior grantees of the lots within Hop Brook was void, invalid and of no effect, and (3) in concluding that the plaintiffs are not entitled to enforce the terms of the restrictive covenants in Hop Brook.

"[T]he determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary. . . . Thus, when faced with a question regarding the construction of language in deeds, the reviewing court does not give the customary deference to the trial court's factual inferences." (Citations omitted; internal quotation marks omitted.) *Contegni* v. *Payne*, 18 Conn. App. 47, 51, 557 A.2d 122, cert. denied, 211 Conn. 806, 559 A.2d 1140 (1989).

In the present case, we are dealing with uniform covenants contained in deeds executed by the owner of property who is dividing his property into building lots under a general development scheme. With respect to this type of covenant, any grantee under a general or uniform development scheme "may enforce the restrictions against any other grantee. *Hooker* v. *Alexander*, 129 Conn. 433, 436, 29 A.2d 308 [1942]." *Pulver* v. *Mascolo*, 155 Conn. 644, 650, 237 A.2d 97 (1967). The doctrine of the enforceability of uniform restrictive covenants is of equitable origin. The equity springs from

the presumption that each purchaser has paid a premium for the property in reliance on the uniform development plan being carried out. While that purchaser is bound by and observes the covenant, it would be inequitable to allow any other landowner who is also subject to the same restriction to violate it. *Whitton* v. *Clark*, supra, 112 Conn. 35.

Here, the uniform plan development must be derived from the language of the covenants inserted in the deeds of various owners' plots and it is necessary to determine "the intent of the owner in creating the restrictions upon any lot to make the benefit of them available . . . to the owners of the other lots in the tract." " 'The meaning and effect of the [restrictions] are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances . . . .' " (Citations omitted.) *Kelly* v. *Ivler*, 187 Conn. 31, 39, 450 A.2d 817 (1982).

The trial court, on the basis of *Contegni* v. *Payne*, supra, 18 Conn. App. 51–53, correctly determined that there are four factors to be considered in determining whether covenants contained in deeds executed by the owner of property who is dividing his property into building lots under a general development scheme so restricted the use of one or more lots under the plan that neighboring owners whose predecessors in title were grantees of the common grantor may enforce certain of the covenants against other owners. These factors are: "(1) the common grantor's selling or stating an intention to sell an entire tract of land, (2) the common grantor's exhibiting a map or plot of the entire tract at the time of the sale of one of the parcels, (3) the actual development of the tract in accordance with the restrictions, and (4) a substantial uniformity in the restrictions imposed in the deeds executed by the common grantor." Id., 53.

It is undisputed that there was a common scheme or plan of development that limited use to single-family homes of a certain minimum cost. The dispute concerns whether the language in the conveyance of the first thirty lots prevented resubdivision of those lots and all the lots in the subdivision into two or more lots, whether the grantor had a right to revoke the covenants and to allow resubdivision in section E as well as to create minimum lot sizes and frontages, and what remedy the plaintiffs have if there is no right to resubdivide. There is no dispute concerning the first two factors from *Contegni*. Whittemore sold and intended to sell all the lots in Hop Brook. The map showing all the lots in Hop Brook was recorded in the land records prior to the sale of the first lot, and the map was referred to in every deed by Whittemore in conveying all the lots. The trial court found that the third factor existed but placed no emphasis on it in considering whether there was a right to resubdivide lot one, section E. Further, from the time of the filing of the map of Hop Brook in 1927, until the defendants sought a resubdivision of lot one, section E, no new lots were created in Hop Brook. Some houses were built on two or more lots and some boundary lines were adjusted making some lots larger and some smaller but not a single additional building lot was created. We will refer to this factor later in our analysis. The trial court specifically found "the fourth factor, the uniformity of the restrictions in the deeds from the common grantor, militates against the plaintiffs' claim here. Of the fifty-two lots conveyed by the common grantor, all appear from the evidence to have contained restrictions limiting use to a single-family dwelling of a minimum size and first cost. None of the deeds specifically restricts subdivision, and eighteen of the deeds specifically allow it with the restriction that no such lot shall be less than a certain size nor with less than a certain frontage." We disagree with this

interpretation by the trial court of the language in the original deeds.

We start with the fact that these covenants were contained in warranty deeds conveying one or more lots from Hop Brook. The language in the covenants and restriction that is pertinent is as follows: "[T]here shall at no time be erected or maintained thereon anything except one private residence for the use of one family only, which private residence, shall cost exclusive of the land not less than $15,000, together with the necessary outbuildings appurtenant thereto."

The language of the restrictions and covenants in this case is similar to that of the covenants and restrictions in *Contegni*. The pertinent language in *Contegni* is as follows: "That the land hereby conveyed shall be used for private residence purposes only, and that there shall not be erected or maintained thereon any buildings other than (1) one family dwelling, the first cost of which shall not be less than $10,000 (2) a stable or carriage house for the horses and vehicles of the occupants of said land only . . . (3) a garage or automobile house for the motor vehicles of the occupants of the said land only . . . ." (Internal quotation marks omitted.) *Contegni* v. *Payne*, supra, 18 Conn. App. 62. In *Contegni* and in the present case, the defendants argued and the trial courts determined, that the plaintiffs could not prevail because of " 'the lack of a clear covenant restricting development to one house per lot.' " Id., 65.

In disagreeing with the trial court's interpretation of this language in *Contegni*, this court stated: "We begin with language itself. The deed conveying the property to the defendants' predecessor forbade the erection of any building on the premises except: (1) one family house . . . (2) a stable or carriage house . . . (3) a garage or automobile house . . . . The defendants maintain that the phrase one family house limits the

type, but not the number, of dwelling houses that might be built on the property. Thus, they argue that single-family houses, as opposed to duplexes or multi-family structures, may be built on the property. The plaintiffs, on the other hand, see the word one as restricting both the number and type of houses on the lot, namely, one single-family house. We agree with the plaintiffs.

"The plaintiffs' reading makes more sense grammatically; the first word after each parenthesized numeral would then be an article. On the other hand, reading the word one to mean single, as the defendants suggest, produces, except (1) *single* family house . . . (2) a stable . . . (3) a garage . . . . The more sensible reading of the restriction, in isolation, is that of the plaintiffs." (Emphasis in original; internal quotation marks omitted.) Id., 65–66.

In this case, the language at issue is clearer than the language in *Contegni*. The pertinent language reads as follows: "And there shall at no time be erected or maintained thereon anything except one private residence for the use of one family only." "Thereon" refers to the lot conveyed. As we deduced in *Contegni* from the language "one family house," "one private residence . . . for one family only" clearly means one single-family residence. Here, the deed clearly states that one house for one family is the limitation on the lot conveyed.

In concluding that Whittemore's intention in the thirty lots conveyed until 1937 was that there be one residence per lot in Hop Brook, we look to two other instruments executed by Whittemore. In 1930, Whittemore, in conveying a portion of lot three, section E, to Lewis A. Dibble, put in the deed a restriction stating that the conveyed portion of lot three can be used only in connection with and as part of lot two, which was previously conveyed to Dibble. No buildings could be built

on the conveyed portion of lot three. In addition, Whittemore stipulated in the deed that it would sell the balance of lot three as one parcel and that it would be subject to the covenants as to the sale and use as set forth in a deed from the grantor to the grantee dated September 30, 1927, which was recorded in the Naugatuck land records. This referred to the deed conveying lot two to Dibble. This instrument, which was executed in 1930, stands for two things. First, the partial conveyance of lot three made lot two larger, yet permitted the construction of only one residence per lot. Second, the remaining portion of lot three was to remain a single lot on which a single residence for a single family could be built. In addition, this parcel was to remain bound by the covenants and restrictions as set forth in the deed of lot two.

In 1927, Whittemore conveyed to Helen W. Adams property described as "Block D" on the map of Hop Brook subject to the same covenants and restrictions that are in controversy here. The map of Hop Brook shows that block D has seven lots. In 1936, Whittemore and all the other owners and holders of mortgages in Hop Brook signed an agreement with Martin Martus, the then owner of parcel D, releasing parcel D from the covenant and restriction in the deed from Whittemore to Helen W. Adams requiring "one private residence for the use of one family. . . ." In consideration of the release of that covenant and restriction the new owner Martus agreed in pertinent part to the following: "[T]here shall at no time be erected or maintained upon any one lot of the *seven* lots comprising said aforesaid premises . . . anything except one private residence for the use of one family only. . . ." (Emphasis added.)

Adams was conveyed parcel D subject to the language, "thereon shall be erected one private residence for one family," clearly indicating that pursuant to the aforementioned deed only one residence could be built

on parcel D. The corrective agreement clearly states that only one residence may be built on each of the seven lots in section D. We find that this is the clear intent of that covenant of September, 1936.

It is also clear that the identical language in the covenant and restrictions in the first thirty lot conveyances of Hop Brook satisfy the fourth prong of *Contegni*, which requires "a substantial uniformity in the restrictions imposed in the deeds executed by the common grantor." *Contegni* v. *Payne*, supra, 18 Conn. App. 53. This substantial uniformity in the clear language of the covenants, coupled with the other *Contegni* factors, make these restrictions binding on all present and subsequent owners of Hop Brook. We conclude that, on the basis of the clear language in the deeds, the subsequent actions of Whittemore and all of the grantees up to 1936 and on our interpretation of similar language in *Contegni* that only one private residence may be built on each lot of Hop Brook.

We next consider the effect of Whittemore's insertion of additional language in the 1937 deed to Dibble, which conveyed portions of lots one and five, section E. This additional language stated that, if Dibble purchased other land in section E, the covenants and restrictions that were the same as in prior deeds could be revoked in whole or in part and others substituted therein. In 1946, Dibble purchased the remaining lots and parts of lots of section E and put in the deed the following pertinent language: "In accordance with and to the extent that power to do so has heretofore been reserved by the Grantor all covenants and restrictions applicable to lands within said section E heretofore purchased by the grantee from the grantor are hereby revoked." In their place, Whittemore allowed for subdivision, minimum frontage, private residence and minimum cost of the residence. We hold that the covenant and restriction of "one private residence per lot," which Whittemore

created on Hop Brook, are binding and that Whittemore had no power on his own or with any other owners of lots to terminate or amend the original covenants.

We agree with the plaintiffs that when, as here, the owner of a tract of land sells lots with restrictive covenants with the following language: "Each and all the foregoing covenants and restrictions are for the mutual benefit of all persons who have derived or who shall derive title, directly or indirectly from the Grantor to any lot or lots shown on the map hereinbefore referred to and shall run with the land in favor of all lots shown on said Map, and any breach or threatened breach of any one or more or all of the covenants and restrictions aforesaid may be enjoined upon application of the Grantor, its successors and assigns, or any person or persons who have derived or shall derive title directly or indirectly from the Grantor to any lot or lots shown on said map" and does not retain the right to rescind or amend them and does not provide a method for terminating or amending them, has no right to do so without the consent of all the then property (lot) owners. See 5 R. Powell, Real Property § 677, pp. 60-118–60-122; *Hein* v. *Lee*, 549 P.2d 286, 292 (Wyo. 1976). In *McCown* v. *Gottlieb*, 465 So. 2d 1120 (Ala. 1985), six lots were sold within a short period of time with uniform restrictive covenants, without a reservation of power to alter or amend the restrictive covenants, and with a declaration in the deed that the restrictive covenants shall run with the land and shall bind said land as well as the present and future owners thereof. The covenants to the lots prohibited subdivision. Twenty-five years after the six lots were sold, the grantor and one of the lot owners executed an instrument entitled "Amendments to Restrictive Covenants," which purported to release the covenant prohibiting subdivision. The Alabama Supreme Court subsequently upheld the ruling of a trial court, holding that since the six lots were

conveyed according to a common scheme of develop-ment, the reservation by the grantor and one of the lot owners was void. Id., 1123.

In this case, the covenants were contained in the original deeds from Whittemore in the first thirty lots conveyed. The covenants expressed in those deeds were uniform and are binding on all the owners of the lots of Hop Brook. The attempt to reserve a power to revoke and amend the covenants in the 1937 deed is void and the subsequent modifications in deeds from Whittemore giving the grantees the right to subdivide are also void. The intent of Whittemore and the grantees is further evidenced by the 1930 deed to Dibble reaf-firming the building of one residence each on lots two and three of section E, the 1936 agreement between Whittemore and all the owners of Hop Brook modifying the original deed of section D to Adams providing that each individual lot in section D may have one private residence only, and by the 1934 modification of the minimum cost provision, which was signed by Whitte-more and all the lot owners of Hop Brook. The defen-dants took title with actual notice of the existence of the restrictions contained in each chain of title. In addi-tion, the facts that no new building lot was created in Hop Brook from the time of the first conveyance by Whittemore until the present case arose and that there was no attempt to subdivide until the present time sup-port our interpretation of the covenants and restric-tions. It is also clear that, since a common plan of development exists, the plaintiffs have the right to enforce the restrictions against the defendants. *Man-ganini* v. *Hodgson*, 138 Conn. 188, 192–93, 82 A.2d 801 (1951).

The trial court's reliance on *Whitten* v. *Clark*, supra, 112 Conn. 28, is misplaced. Although there are many factual differences between the two cases, the control-ling difference is that in *Whitten* the right to reenter

upon a breach was given to the grantor or his legal representatives. Our Supreme Court held "[i]n such a situation it is not reasonably possible to find that [common grantor] adopted any such general plan or scheme for the development of the tract as would create as among the various lot owners a right to enforce among themselves the provisions of the stipulation . . . ." Id., 38. In the present case, however, a common scheme does exist and the Hop Brook lot owners have a right to enforce the covenants against each other.

The defendants claim, as an alternative ground for affirmance, that the plaintiffs' interest in the right to enforce the restriction against resubdivision of the subject property has been rendered null and void by operation of law under the Marketable Title Act. Specifically, they argue that the act obligates the plaintiffs to record in the defendants' chain of title a notice setting forth the nature of their claim. In the absence of such a notice, they contend, the plaintiffs' interest in the defendants' land is nonexistent. As noted earlier, the trial court did not rule on that claim, which was raised as a special defense. Although that ground was raised as an alternate ground for sustaining the judgment, "we believe that it is better left to the trial court to determine. We therefore decline to review this claim." *Essex Leasing, Inc.* v. *Zoning Board of Appeals,* 9 Conn. App. 391, 395–96, 518 A.2d 970 (1986), aff'd, 206 Conn. 595, 539 A.2d 101 (1988).

The judgment is reversed and the case is remanded for further proceedings to consider the defendants' special defense relating to the Marketable Title Act.

In this opinion the other judges concurred.