[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter has been submitted following a remand from the Appellate Court. In Spector v. Konover, 57 Conn. App. 121 (2000), the Appellate Court reversed the judgment of the trial court, which had found in favor of the defendants, and remanded the case to the trial court for the purpose of finding damages. The parties agreed to submit the matter on the previous record before the trial court, and the issues were extensively briefed and argued.
The background information appears in Simon v. Konover, supra, and need not be reviewed in great detail for the purpose of this memorandum. In sum, the plaintiff trustee is the successor in interest to Martin Spector, who entered into an oral agreement in 1961 with Abner Rosenberg, Simon Konover and Marvin Patron to form a partnership ("Tri Town Realty CT Page 12180 Co.") for the purposes of developing a shopping center ("Tn Town Plaza") in Seymour, CT. Spector and Rosenberg supplied the land for the venture, and Konover and Patron supplied the expertise in building, operating and maintaining the plaza. The agreement apparently was never reduced to writing. Larry Spector as trustee is the successor to Martin Spector's twenty-five percent interest. The defendants in this case are Simon Konover and Konover Management Corporation.
Konover and Patron managed the shopping center, at first on a very informal basis. But over time they acquired interests in and managed a considerable number of properties, and they ultimately hired managers and charged fees and commissions for managing the businesses. Konover and Patron became K and P Management Company, which became the defendant Konover Management Corporation. But the organizational structure of TriTown never changed, so that common law and statutory obligations of partnership applied.
The managers did send monthly reports, at least as early as the 1980s, and Larry Spector, who as trustee had assumed an interest in the partnership, made several inquiries both himself and through counsel regarding the management of the partnership and the distribution of money. The partnership's tax returns apparently showed considerable income, but relatively little was being distributed to the partners. Following a complaint in 1985, the monthly distribution was increased from $500 per month to $1200 per month. A letter in 1989 which requested an explanation of various expenses and an increase in distributions was not answered. In May, 1989, a letter from Spector's Arizona counsel demanding termination of the partnership was not answered.
In 1990, the defendants stopped distributing profits to the plaintiff, for the stated reason that funds were needed to cushion the blows caused by the declaration of bankruptcy of Ames, the anchor tenant. At about the same time suit was commenced in Arizona to dissolve the partnership, but that action was dismissed for lack of personal jurisdiction.
In 1994 the plaintiff hired a certified public accountant to examine the books of the partnership. The accountant discovered that no account was kept exclusively for Tri Town, but that its finances were combined with approximately fifteen other Konover entities. He also discovered that income from TriTown was being used for the benefit of other entities. The entire checking account had much less money in it than the balance of Tri Town as reflected in tax returns. As appears from records[1] in the exhibits, the accountant also investigated various fees and expenses attributed to the Tri Town account.
Meanwhile, a prior action was brought in 1991 in Connecticut; this CT Page 12181 action claimed a termination of the partnership, an accounting and a claim for breach of fiduciary duty. This action culminated in a Settlement Agreement as of September 30, 1994. As a result of this agreement, Spector received 25% of the existing cash balance and bought from Konover interests the remaining 75% of the partnership.[2] The agreement specifically left open any action on the accounting.
This action, brought in 1995, followed. After a six day trial to the court, Allen, J.T.R., entered judgment in favor of the defendants. Although she found that Konover[3] owed a fiduciary duty to Spector, she found that Konover had dealt fairly with Spector and entered judgment in favor of Konover.
The Appellate Court reversed. It determined that Konover owed the Spector interest a fiduciary duty, and that Konover did not prove fair dealing by clear and convincing evidence. In Part II of its opinion, the court stated that the "breaches of the fiduciary duty to the plaintiff entitle the plaintiff to damages, including the reimbursement of any improper fees and charges, interest for the loss of use of profits, and a constructive trust over the profits the defendants received through improper use of partnership funds. Additionally, we conclude that the defendants' actions constitute a violation of . . . (CUTPA) . . .; accordingly, the plaintiffs are also entitled to damages provided under that act." Id., at 132. The precise remand was: "[t]he judgment is reversed and the case is remanded with direction to render judgment for the plaintiff and for further proceedings to determine damages consistent with this opinion." Id., 134.
The first issue is the scope of the remand. The black letter law is easy to state but sometimes difficult to apply:
 "Well established principles govern further proceedings after a remand by this court. In carrying out a mandate of this court, the trial court is limited to the specific direction of the mandate as interpreted in light of the opinion. . . . This is the guiding principle that the trial court must observe. . . . It is the duty of the trial court on remand to comply strictly with the mandate of the appellate court according to its true intent and meaning. . . . The trial court should examine the mandate and the opinion of the reviewing court and proceed in conformity with the views expressed therein. . . . Halpern v. Board of Education, 231 Conn. 308, 311, 649 A.2d 534 (1994)." (Emphasis in original; internal quotation marks omitted.) Rizzo Pool Co. v.Del CT Page 12182 Grosso, 240 Conn. 58, 65, 689 A.2d 1097 (1997). "We have rejected efforts to construe our remand orders so narrowly as to prohibit a trial court from considering matters relevant to the issues upon which further proceedings are ordered that may not have been envisioned at the time of the remand. Blaker v. Planning Zoning Commission, 219 Conn. 139, 592 A.2d 155
(1991). So long as these matters are not extraneous to the issues and purposes of the remand, they may be brought into the remand hearing. Cioffoletti v. Planning Zoning Commission, 220 Conn. 362, 369, 599 A.2d 9 (1991)." (Internal quotation marks omitted.) Halpern v. Board of Education, supra, 313.
Higgins v. Karp, 243 Conn. 495, 502-03 (1998).
The defendants argue that because their special defenses, including release, waiver, laches and various statutes of limitations, were never considered on their merits, they should now be considered on remand. The plaintiff contends that the Appellate Court remand specifically limited the role of the trial court to determine damages only.
The appropriate role of the trial court, as described in opinions such as Higgins, supra, Halpern v. Board of Education, supra; West Haven SoundDevelopment Corporation v. West Haven, 207 Conn. 308, 312-15 (1988); andWendland v. Ridgefield Construction Services, Inc., 190 Conn. 791, supra, is to interpret and apply the specific rescript consistently with the opinion as a whole. Where error is found and the matter is remanded simply for "further proceedings", the mandate appears to be rather broad. In West Haven Sound Development, supra, the case had been remanded for the purpose of determining damages. The trial court, in light of the remand, reexamined causation of damages as well as dollar amounts, in the sense of what damages had been caused by a breach of contract, and the Supreme Court affirmed the trial court's somewhat broad reading of the remand. It reviewed its prior decision, and concluded that it "had found error in virtually every issue pertaining to the award of damages"; id., 314; and that therefore a broad review was consistent with the remand and with the prior opinion as a whole. Similarly, in Wendland, supra, a remand "for further proceedings according to law" did not foreclose revisiting the amount of damages where the prior reversible error had lain in a negligence per se instruction. The court stated that where the remand is "for further proceedings" according to law, the prior judgment is destroyed and a new trial of all the issues is required. If new evidence or new procedures are germane to the proceedings on remand, then they should be considered. Higgins, supra; Halpern, supra. CT Page 12183
With these principles in mind, I turn to the matter at hand. The terms of the remand itself are very narrow: the trial court is to enter judgment in favor of the plaintiff and is to conduct further proceedings to determine damages consistent with the opinion. The opinion, in turn, specifically states that the plaintiff is entitled to damages for the reimbursement of any improper fees and charges, interest for the loss of use of profits, and a constructive trust imposed on any profits received through improper use of funds, as well as damages for the violation of CUTPA which the Appellate Court specifically found. The opinion itself found liability and directed the trial court to find specific categories of damages.
Further, the opinion specifically considered one of the special defenses, that of release. The defendants had argued that, by a combination of the complaint in the prior action, the settlement agreement, and the withdrawal of count one[4] of this action, that the plaintiff had effectively released any remaining claim. The trial court never ruled on the issue, because it had found that the defendants proved fair dealing in any event by clear and convincing evidence. The Appellate Court noted (at 123, n. 4) that the trial court made no findings on the issue of release and that the defendants had not requested an articulation.[5] Therefore, the record was inadequate for review and the claim of release was not considered by that court. When the opinion is examined as a whole, it is clear that the intent of the Appellate Court was, in the circumstances, not to have the trial court consider the defense of release. Otherwise, it could hardly have ordered that judgment enter in favor of the plaintiff and directed the finding of damages as recited in the opinion. By logical extension, the same reasoning applies to the defense of waiver.[6]
This interpretation of the remand is buttressed by the observation that when the Appellate Court intends consideration of special defenses, it may say so. See, e.g., Mannweiler v. LaFlamme, 46 Conn. App. 525, 544
(1997); Shelby Mutual Ins. Co. v. Della Ghelfa, 3 Conn. App. 432, 450
(1985) ("[T]he case is remanded with direction to render judgment for the plaintiff in the amount of . . . against the defendant [D], and against the defendant [R] unless he establishes his nineteenth special defense in a hearing limited to that issue."). In sum, I find that the remand in this case, interpreted in light of the opinion as a whole, prohibits consideration of the special defenses, and the circumstances are very much like those in Metropolitan District Commission, supra.[7]
The remand specifically ordered the calculation of damages to include a constructive trust, interest for the loss of use of profits, the reimbursement of any improper fees and charges and appropriate damages pursuant to CUTPA. I have computed damages according to the attached CT Page 12184 schedules, which generally follow the format of Exhibit 97 and Exhibit 110. The summary of those schedules results in damages, compounded to July 31, 2001, in the amount of $324,027.07 in compensatory damages, plus $200,000 in punitive damages and $86,697.25 in attorney's fees for a total of $610,724.32.
Some comment on the methodology of the computations, and the underlying considerations, may be useful. Schedule A includes the computation regarding undistributed cash which was attributed as income to Tri Town but which was diverted to other Konover entities. The method and underlying numbers were taken from Exhibit 97 and its sources. I did the calculations. Because each partner owes every other partner the fiduciary duty of scrupulously fair dealing, a constructive trust is imposed on assets wrongfully diverted from a partnership and the trust includes the diverted amounts and any "secret profits." See, e.g., Vignean v. StorchEngineers, 1995 WL 767984, 1995 Ct. Sup. 3361 (Satter, J.) (1995), and authority cited therein; Spector v. Konover, supra; see also Barnett v.Securities Group, 2 F.3d 1098 (11th Cir. 1993). The amounts diverted are set out and are relatively simple to determine. I find, however, that the plaintiff has not proved any "secret profits". The diverted funds were actually used to offset problems with other partnerships, and the record seems to disclose that little or no profit was actually made from the diverted money. If money is diverted and a profit is realized thereby, a partner is entitled to his share of the profit, at least partly on the theory that the wrongdoer has deprived the partnership of an opportunity and he ought not to profit by wrongdoing. In this case, there has been no persuasive showing of any secondary profit on the use of the diverted funds.[8] The role of damages is to place the innocent partner in the same position he would have been in had no wrongdoing occurred; see 59A Am.Jur.2d 550, "Partnership" § 629; and there simply is no persuasive evidence of any secret profits on which to impose a trust.
I did, on the other hand, compound interest at the rate of 10% annually. Section 37-3a of the General Statutes provides some guidance for the wrongful detention of money, and clearly the plaintiff is entitled to compensation for the loss of use of money. While he may have made more money had he had the opportunity to invest it, he also may have made less. Rather than idly speculate, it seems appropriate and perhaps mandatory to apply the statutory rate.
There also was considerable argument between the parties as to the appropriate amount to set as a hypothetical reserve for the operation of the shopping center. The amount of the reserve affects the amount of undistributed cash. If one agrees that a certain amount would prudently be set aside to meet expenses,[9] then the amount set aside would not be distributed to the partners. As can be seen from a comparison of CT Page 12185 Schedule A attached to this opinion and the second half of Exhibit 97, which is a compilation of damages compounded at 10% with a $20,000 reserve, the principal mathematical consequence of a higher reserve is to delay the distribution of profits, which in turn decreases the time over which the amount will be compounded.
The plaintiff argued that a reserve of $20,000 would have been sufficient. I do not find persuasive the justification for the proposition that that amount of reserve would have been adequate. I do find persuasive the testimony of Ms. Whitney to the effect that a minimum reserve of six months' expenses was standard in the industry. In this case, approximately $90,000 represents six months of expenses. I find that the defendants' suggested figures of $200,000 and $250,000 are speculative and not persuasive. For the purpose of the computation, I have determined from a consideration of the evidence offered at the previous trial that a reserve of $100,000 is appropriate. Using the reserve of $100,000 and the 10% compounding, and reducing the number by the distribution of principal made on September 30, 1994, compounded annually at 10%, one reaches the number of $56,394.40 as the value of undistributed cash as of September 30, 1997.[10]
The second item of damages is the amount of management fees which Konover charged the partnership. Self-dealing is a breach of fiduciary duty and the plaintiff is entitled to return of the management fees, with 10% compounded interest. See Spector v. Konover, supra. In the case of self-dealing, the defendant is not entitled to a setoff or deduction of the amount of damages on the ground that some amount of money would have to be spent on the services in any event. See 59A Am.Jur.2d, supra, § 632. On the facts of this case, the original 50% partnership interest on Konover and Patron was based on the notion that they would be providing the expertise in any event. I accept, then, the plaintiff's accountant's summary at Exhibit 97, compounded at 10%, for a total as of September 30, 1997, of $134,857.60.
The next item for consideration is the amount expended by Konover for insurance coverage. Because this expense is not specifically self-dealing, and insurance expenses would have to be made in any event, the considerations are different from those involving the management fees. According to the evidence submitted at the first trial, Konover apparently combined a number of properties for the purpose of securing coverage, and the types of insurance plans varied somewhat over the years. Evidence was submitted which discussed complications caused by the loss experience and the variation in rates over the years depending on the insurance market.
The plaintiff compiled a table which purports to state excess payments CT Page 12186 made by Tri Town for insurance coverage. The table was computed by means of first averaging the cost to insure Tri Town over approximately a three year period after Spector bought out the Konover interest and it was operated as an independent entity. This average, $15,368, was then subtracted from the amounts which were reflected as insurance expenses on the tax returns for the years 1986-1991. The theory is that the difference was overpayment.
I find this approach somewhat simplistic and not justified by the evidence. First, there was evidence that commercial insurance costs were decreasing during the period of time for which the average was computed. Second, there was no persuasive comparison of coverage. Third, even if Konover paid more than he had to for coverage for Tri Town, as an expense of the partnership, I am not persuaded that the overpayment is the result of commingling or diversion of partnership funds and expenses from one partnership to another. In short, the evidence is too speculative to justify the suggested conclusion.
I do find, however, that the insurance overhead charge is self-dealing and must be returned to the plaintiff with interest. The evidence supports the conclusion that Konover charged "insurance overhead" of $451 for the years 1984-1990 and 1994-95.[11] Schedule B shows the compounding at 10%. The result is an amount of $10,156.03.
Konover also charged the partnership for leasing commissions in later years. Again, there was no agreement among the partners allowing this expense, and the practice amounted to self-dealing. The return of the leasing commissions, with interest compounded at 10%, results in compensation of $16,442.39, as tabulated in Exhibit 97.
Payroll maintenance fees may be treated similarly to the leasing commissions. As shown in Exhibit 97, compounded at 10%, this item of damages amounts to $6,876.20.
Total compensatory damages as of September 30, 1997, then, are $224,726.62.[12] I compounded this number annually at 10% to reach the final figure for compensatory damages of $324,027.07, as of July 31, 2001.
The Appellate Court directed the trial court to consider punitive damages and attorney's fees pursuant to CUTPA, and specifically found (pp. 133-34) that the defendants' conduct constituted unfair trade practices in violation of CUTPA. In light of the requests for information and the history of at least partially ignoring the entreaties of a partner and the protracted history of self-dealing, punitive damages are appropriate. On the other hand, it was largely through the efforts of the CT Page 12187 defendants that the partnership made money, and business was conducted informally by agreement, at least in the early stages of the business relationship. I also consider the evidence that the Konover entities have a value of many millions of dollars. I find the sum of $200,000.00 appropriate in the circumstances of this case.
Finally, the lodestar figure of $86,697.25 is appropriate. Neither party has suggested that any adjustments to the lodestar are required in this matter. Total damages, then, are $610,724.32. Judgment may enter accordingly.
Beach, J.
 SCHEDULE A UNDISTRIBUTED CASH
Cash Annual CompoundedYear Balance Reserve Available 25% Shortfall to 9-30-97
1985 63,773 100,000 — — — — 1986 107,872 100,000 7,872 1,968 1,968 5,487.33 1987 159,256 100,000 59,256 14,814 12,846 32,561.96 1988 169,376 100,000 69,376 17,344 2,530 5,829.45 1989 227,876 100,000 127,876 31,969 14,625 30,638.01 1990 294,558 100,000 194,558 48,639.50 16,670.50 31,747.77 1991 363,510 100,000 263,510 65,877.50 17,238 29,844.12 1992 463,877 100,000 363,877 90,969.25 25,091.75 39,492.88 1993 378,302 100,000 278,302 69,575.50 (21,393.75) (30,611.43) 1994 495,961 — 495,961 123,990.25 54,414.75 72,426.03
(to 9-30) 217,416.12 Less distribution of 9-30-94, compounded at 10% 161,021.72
to 9-30-97 TOTAL 56,394.40
Notes: 1) Annual shortfall compounded at 10% annually
2) Reserve set at $100,000
 3) Cash Balance numbers taken from Exhibit 79 (also used in Exhibit 110)
 4) Methodology same as that used by the experts (Goldblatt and Whitney) in their trial testimony.
 SCHEDULE B
CT Page 12188 INSURANCE OVERHEAD PAYMENTS
Overhead Compounded at Year Charge 10% to 9-30-97 1984 451 1673.75 1985 451 1521.59 1986 451 1383.26 1987 451 1257.51 1988 451 1169.78 1989 451 1063.43 1990 451 966.76
1994 451 586.64 1995 451 533.31
10,156.03