[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Kenneth R. and Betty Lou Wiseman were the owners in fee simple of certain premises shown and designated on a map entitled "Proposed Subdivision Map Prepared for Kenneth R. Betty Lou Wiseman Meadow Bostwick Streets `Lakeville' Salisbury, Connecticut Scale 1" = 50' April 5, 1988 Total Area = 8.837 ± Acres, " which map was certified to have been prepared in accordance with the standards of a Class A-2 Survey as defined in the Code of Practice for Standards of Accuracy of Surveys and Maps, adopted December 10, 1975, as amended by the Connecticut Association of Land Surveyors, Inc. by Peter A. Lamb, R.L.S. No. 7764, and which map is found in the office of the town clerk of Salisbury, Connecticut, as Map #1936. On September 11, 1989, the Wisemans filed a Declaration of Restrictive Covenants benefitting and encumbering lots numbers one (1), two (2) and three (3) of their proposed subdivision, as shown on the previously identified map. Those covenants were recorded in Volume 145, Pages 976-980 of the Salisbury Land Records on September 12, 1989.
The Wisemans, in their preliminary declaration, expressed an intent to impose certain restrictions, covenants and conditions upon the aforesaid premises and/or divisions, subdivisions, resubdivisions, or portions thereof. They continued on by reciting that "the Grantors, for themselves, their heirs, executors, administrators, successors and assigns make, publish, and impose the following restrictions and covenants upon the aforesaid premises and any division, subdivision, resubdivision, or portion thereof; and by acceptance of any deed to the premises or any division, subdivision, resubdivision or portion thereof, any grantee thereof, for himself or itself, his or its heirs, executors, administrators, successors and assigns, covenants and agrees with the aforesaid Grantors as follows. . . ."
When the plaintiff Ginouves was negotiating for the purchase of the parcel which he owns, lot one (1), he expressed an opinion that the CT Page 11155 covenants did not apply to lot number three (3). In view of the recitation of the grantor's intent and purpose as well as the specific mention of lot number three (3) in covenant ten (10), the minutes of the municipal board and a certain note on the approved subdivision map, one must question the accuracy of this opinion. However, that particular issue becomes moot. It cannot be seriously disputed that these covenants run with the land and provide for enforcement by the owner or owners of any lot or lots deriving title from or through the Wisemans.[1]
A brief chronology of the relevant conveyances to the properties involved in this litigation appears to be in order at this point. All of the conveyances herein are recorded in the Salisbury Land Records. On February 22, 1988, William A. and Margery C. Duus conveyed the subject property to Kenneth R. and Betty Lou Wiseman by warranty deed, which deed is recorded in Volume 142 at Page 56. As previously set forth, the first Declaration of Restrictive Covenants was dated September 11, 1989 and recorded in Volume 145, Page 979. The covenants were subject to an amendment on June 7, 1999, which amended declaration is recorded in Volume 148, Page 152.[2] On September 11, 1989, Kenneth R. and Betty Lou Wiseman conveyed the title to lot number one (1) to Albert P. Ginouves by warranty deed, which deed is recorded in Volume 145, Page 1004. On October 9, 1992, Ginouves conveyed the title to lot number one (1) to himself and to Amy Lake, as joint tenants with right of survivorship, which deed is recorded in Volume 153 at Page 395. On June 29, 1993, Kenneth R. and Betty Lou Wiseman conveyed the title to lot number three (3) to Robert S. Segalla by warranty deed, which deed is recorded in Volume 155, Pages 911-913. On September 29, 1993, Segalla conveyed the title to lot number three (3) to Kevin G. and Kathleen F. McGivern by warranty deed, which deed is recorded in Volume 156, Page 833.[3]
On August 2, 2000, Walter Carl Burcroff conveyed the title of the property he received from Ann Schlecht Burcroff on September 19, 1977 to the McGiverns by warranty deed, which deed is recorded in Volume 176 at Page 908. Virtually simultaneously, on that same date, Walter Carl Burcroff conveyed the title to the land he received from the Wisemans on April 2, 1993 to Kevin G. and Kathleen F. McGivern by quitclaim deed, which deed is recorded in Volume 176 at Page 910. This parcel, which was quitclaimed, is of the approximate dimensions fifty (50) by two hundred nine point five (209.5) feet and is a rectangular portion of a prospective right-of-way as shown on the proposed extension of Bostwick Street, as shown on the reference maps.[4]
While it might be argued that neither of the Burcroff conveyances to the McGiverns was subjected to the benefit and/or the burden of the CT Page 11156 declaration of the specific restrictive covenants, as amended, the quitclaim deed of the rectangular parcel contained the following language: "Said premises are conveyed subject to such easements, restrictions and covenants as of record may appear, IF ANY."[5]
(Emphasis supplied.) The conveyance of the major Burcroff property which Walter Carl Burcroff received from Ann Schlecht Burcroff on September 19, 1977, clearly predated the Declaration of Restrictive Covenants, and the conveyance from Burcroff "to the McGiverns offered no attempt nor any language to suggest that it was Burcroff's intent to subject that property which was never within the three (3) lot subdivision to the covenants, nor was it possible.
On June 6, 1990, Kenneth R. and Betty Lou Wiseman conveyed the title to lot number two (2) to JoAnn S. McKee by warranty deed, which deed is recorded in Volume 148, Page 141. On September 23, 1997, JoAnn S. Dube conveyed the title to lot number two (2) to Richard B. and Carolyn D. Culliton by warranty deed, which deed is recorded in Volume 167, Page 489.[6] The Ginouves (Lake) and Culliton remain the owners of lots one (1) and two (2) respectively.
While covenant eleven (11) is of some significance in this matter, covenants four (4) and eight (8) are the covenants which sustain or frustrate the McGiverns' intention. Subparagraph (b) of four (4) recites that "[n]o building shall be erected or maintained on any lot other than a single family dwelling house, and a garage and other outbuildings incidental to such residential use including, except as otherwise provided herein, one guest house." Covenant number eight (8), entitled "Subdivision, " provides that "[n]o lot may be further subdivided provided, however, that any owner of a lot may resubdivide it in order to convey a portion of his lot to an adjoining lot owner so long as such conveyance does not create an additional building lot and so long as such resubdivision does not reduce the size of the original lot to less than seventy-five (75%) percent of its original size."
It is the avowed intention of the McGiverns to erect a second dwelling house on lot number three (3) "approximately sixty (60) feet long and twenty-eight (28) feet wide with a two (2) car garage." The reason for their intended construction on a "revised lot three (3)" is two-fold; first, a monetary benefit, and second; the alleged health problems of Mrs. McGivern. Interestingly enough, as noted by the plaintiffs, although present throughout the hearing, Mrs. McGivern did not testify with respect to any such condition nor was there any medical evidence offered to substantiate the so-called medical problem.
The Burcroff conveyance of the property received from Ann Schlecht CT Page 11157 Burcroff on September 19, 1977, by warranty deed recorded in Volume 176, Page 908, was of lands lying generally north/northeast of the original subdivision; and the conveyance of the rectangular piece by quitclaim deed on the same day, which deed was recorded in Volume 176 at Pages 910-911, which parcel also lies north/northeast of the land described in the warranty deed, recorded in Volume 176, page 908. That rectangular piece appeared to bisect the original Ann Schlecht Burcroff property.
Reliance, as previously noted upon the exhibits offered, specifically the map of the proposed subdivision,[7] is of substantial assistance to this court. It is the McGiverns' contention that these conveyances constitute additional property permitting them to subdivide the original lot three (3). It cannot be seriously disputed that the Burcroff land, as described in the two deeds to the McGiverns, were lands which were never included in the subdivision with which we are concerned.
The McGiverns' position is that the Burcroff conveyances were by some tour de force merged with or were drawn into or were pulled into the original lot number three (3), enabling them to redesignate the original lot three (3) with the additional land as lot three (3) "A" and lot three (3) "B." That premise concerning a merger drawn in and/or pulled in to describe the existent property is supported by no evidence whatsoever and necessarily falls under its weight. As noted, the conveyance of the rectangular piece of the Wisemans to Burcroff on April 2, 1993 and recorded in Volume 154 at Page 1031 and DRAWN IN ON the subdivision map by the court, immediately discloses that that rectangular piece, as described in the deeds dealing with it, was never a part of the original subdivision and was therefore never conveyed out of it. (Emphasis supplied.) That rectangular piece which, as stated, bisected the Amy Schlecht Burcroff piece, was subsequently conveyed to Walter Carl Burcroff eliminating that bisection. There is no evidence of any attempt to amend the covenants by the Wisemans with or without the owners of all three subdivision lots joining such an effort. There is no evidence of a conveyance to the Wisemans by the McGiverns and a conveyance back, without mention or reference to the covenants. There is no subsequent action affecting the three (3) lot subdivision by the municipal agency, which agency's original approval was for a three (3) lot subdivision with "notes."[8] Any or all of these events, had they occurred, might arguably sustain the McGiverns' interpretation as they pursued their objective. Perhaps the final nail in the coffin, as it were, is the provision in the Segalla deed from the Wisemans and his deed to the McGiverns that "[s]aid premises shall not be further subdivided, " which follows the provision subjecting lot three (3) to "[a] certain Declaration of Restrictions and Covenants. . . . This language is certainly a manifestation of the Wisemans' intent to preclude "further CT Page 11158 subdivision" of the McGiverns' land. The additional lands and the stroke of a pen "subdividing" lot three (3) is certainly not consistent with the covenants, not to mention the situation following an additional home constructed on the same portion of lot three (3) where their present home is located.
The defendants called Attorney Mark Capecelatro, the attorney who drew the covenants and amendment thereto. Questions directed to Mr. Capecelatro merely invoked a claim of privilege. Neither of the Wisemans was present in court nor was any writing or indicia of the authority of Mr. Capecelatro. as their agent suggested. Certain it is that he testified that he had talked to the Wisemans and they had authorized him to testify on their behalf and, in effect, wave the privilege of confidentiality. That testimony violated two basic tenets. The first of which is that proof of agency cannot be proven through the mere uncorroborated statement of an agent himself as to his authorization and, more importantly, the fact that the testimony offered was pure, unadulterated hearsay without suggestion of any of the recognized exceptions to the rule for purposes of admissibility. See Kirkland v.Sapphire International Touring Limited, D.C.N.Y., 262 F. Sup. 309;Valley Ranch Development Co., Ltd. v. FDIC, 960 F.2d 558 (5th Cir. 1993); 3 Am.Jur.2d Agency, Sec. 347 (2002). Despite the assertions of the McGiverns, this court' is satisfied that the language which it encountered in the exhibits offered by both parties is clear and unambiguous and is in need of no further interpretation.
The plaintiffs and each of them have both the contractual and a legal right under covenant eleven (11) to enforce the terms of the covenants. The owners of parcels of land subject to a general plan of development have standing to enforce the plan of development. Contegni v. Payne,18 Conn. App. 47, 52 (1989), cert. denied, 211 Conn. 806 (1989); seeMaganini v. Hodgson, 138 Conn. 188, 193-94 (1951). They are also entitled to the injunction they seek without a formal showing of irreparable harm by virtue of their status as co-owners in the Wisemans' subdivision.Hartford Electric Light Co. v. Levitz, 173 Conn. 15, 22 (1977).
Our case law addressing a factual scenario much like the one at issue herein has held that where a said property is subject to a common plan of development or restrictive covenants, the complaining owners have a right to enforce those covenants. See Mannweiler v. LaFlamme, 46 Conn. App. 525,535 (1997); Hooker v. Alexander, 129 Conn. 433, 436 (1942); Pulver v.Mascolo, 155 Conn. 644, 650 (1967). The granting of an injunction in such a case rests within the sound discretion of the trial court and "[un exercising that discretion, the court . . . may consider and balance the injury complained of with that which will result from interference by CT Page 11159 injunction." Castonguay v. Plourde, 46 Conn. App. 251, 267 (1997).
The defendants have filed a counterclaim on the basis of the plaintiff' s admission that he had indeed erected a metal fence on his property, and that that metal fence, while there, violated Section four (4)(d) of the covenants which prohibit metal fencing on any of the lots in the original three (3) lot subdivision. The explanation thereof by the plaintiffs was that they had the permission of the abutting landowners and, if to be believed, the defendants themselves joined in this permission. It also indicates that the fence is no longer in place.
The erection and maintenance, even though subsequently removed, of a metal fence does indeed constitute a technical violation of the covenant. The question of whether or not there was consent might well preclude the defendants' success on this particular claim. Under the circumstances, this court in its discretion declines to issue the injunction sought, together with the claim for counsel fees submitted by the defendants. The allegation appears to simply be an afterthought. It should also be remembered that there is absolutely no substantiation for the claim of counsel fees in the amount expressed and, therefore, the defendants have failed to meet the burden of proof on that allegation.
The court is more than satisfied that the plaintiffs have met their burden of proof and are therefore entitled to the injunction they seek against the defendants' intended actions, which the court finds to be a violation of the aforesaid deeds and covenants. The plaintiffs are, accordingly, directed to submit a draft of the injunction which they seek, and the defendants are ordered to prepare to be heard thereon unless they choose not to contest the injunction as to form.
Moraghan, J.T.R.