[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE POST TRIAL MOTIONS
 I FACTS
The plaintiffs brought this action in multiple alternative counts for reduction in the value of their residence by actions of the defendant developers of the subdivision known as Arbor Commons on Kensington Road in Berlin. The jury found for the plaintiffs on three of those counts. It awarded $30,000 for breach of the restrictive covenants established for the development of the subdivision, as well as $30,000 for breach of the developers' fiduciary duty based on those covenants. On the count for negligent misrepresentation, the jury found total damages to have been $35,000 and found the plaintiffs' comparative negligence contributed forty-nine percent to those damages for an effective award of $17,850.00.
Also tried to the jury were five counterclaims brought by the defendant CT Page 7885 developers for breach of the restrictive covenants by the plaintiffs, libel and slander, willful, wanton and malicious conduct, breach of the covenant of good faith and fair dealing, and invasion of privacy. The jury awarded the defendants $50,000 for libel and slander and $15,000 for invasion of privacy. It found for the plaintiffs on the remaining counts. The net effect of the jury's award, without any reductions, would be to award the plaintiffs the total sum of $12,850.00.
Because the plaintiffs made alternative claims for one injury, confirmation of the amounts awarded on all counts for the plaintiffs would violate the public policy against more than one recovery for the same injury. "It is a time-honored rule that an injured party is entitled to a full recovery only once for the harm suffered." Buell v. AmericanUniversal Ins. Co., 224 Conn. 766, 775, 621 A.2d 262 (1993). "[A] litigant may recover just damages for the same loss only once. The social policy behind this concept is that it is a waste of society's economic resources to do more than compensate an injured party for a loss and, therefore, that the judicial machinery should not be engaged in shifting a loss in order to create such an economic waste." (Emphasis omitted.)Haynes v. Yale-New Haven Hospital, 243 Conn. 17, 23-24, 699 A.2d 964
(1997). "Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments." Thus, were there not other claims to address, the plaintiffs would be entitled to $30,000 and the defendants $65,000, requiring the plaintiffs to compensate the defendants $35,000.00.
Both the plaintiffs and the defendants have filed motions to set aside the sums awarded. The plaintiffs claim that the economic damages awarded on the libel and slander count are excessive, against the evidence and the law and must be set aside. Specifically, they claim the evidence concerning economic damages was insufficient to show the special damages required in a defamation case. For the reasons stated in detail below, the court denies the motion.
Defendants attack all three awards to the plaintiffs. Their claims concerning the breach of restrictive covenants and the breach of fiduciary duty are similar in that they both relate to the meaning and effect of the covenants. On the first count, the defendants claim they adhered to the specific enumerated paragraphs in the covenants and that there is no evidence to demonstrate that they breached any specific requirement. In addition, they claim that the court's interpretation of the covenants and its instructions were in error. With respect to the breach of fiduciary duty count, they challenge that there was any specific duty imposed upon the defendants by those covenants. As to all three counts, they challenge the evidence supporting any reduction in the value of the plaintiffs' home and claim there is no basis for such an CT Page 7886 award. They also filed a supplemental motion to set aside the verdict as they reflected multiple recoveries for the same injury the plaintiffs sustained. For the reasons stated, the court denies the motion to set aside the verdict and grants the supplemental motion.
 II DISCUSSION
A. Standard of Review Concerning Motions to Set Aside a Verdict.
In determining whether or not any verdict is excessive as a matter of law, the court must review the evidence as a whole and determine whether it supports the verdict entered. "When considering a motion to set aside the verdict, this court's function is to determine whether the evidence, viewed in the light most favorable to the prevailing party, reasonably supports the jury's verdict." (Internal quotation marks omitted.)Skrypiec v. Noonan, 228 Conn. 1, 10, 633 A.2d 716 (1993), Preston v.Wellspeak, 62 Conn. App. 77, 81, 767 A.2d 1259 (2001). "A trial court may set aside a verdict on a finding that the verdict is manifestly unjust because, given the evidence presented, the jury mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case could be applied." Card v. State, 57 Conn. App. 134,138, 747 A.2d 32 (2000). "A verdict should not be set aside, however, where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion." (Internal quotation marks omitted.) Kurti v. Becker, 54 Conn. App. 335, 337, 733 A.2d 916, cert. denied, 251 Conn. 909, 739 A.2d 1248 (1999). Mather v. Griffin Hospital,207 Conn. 125, 138-139, 540 AS.2d 666 (1988) states as follows: "Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair minded persons as to the amount that should be awarded. This right is one obviously immovable limitation on a legal discretion of the court to set aside a verdict since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair minded men passed upon by the jury and not by the court. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to this verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption." (Citations and internal quotations omitted.) CT Page 7887
B. The Plaintiffs' Case
(1) The Restrictive Covenants
Turning first to the plaintiffs' case in chief as challenged by the defendants, the jury could have found the following:
Prior to the sale of the lot known as Lot 19 on Renn Road in the Arbor Commons subdivision to the plaintiffs, the defendants signed and recorded a certain "Declaration of Restrictive Covenants" on the land records in the town of Berlin.[1] Those covenants were drafted on behalf of the developers by their own counsel. They contain fifteen specific paragraphs and a preamble. In general, the specific provisions are to ensure that the subdivision remains residential in nature, ensuring no noxious or offensive activities are carried out on any lot, and no farm animals kept. They also provide the developers the right to control the nature and character of any residences built by lot owners. The preamble articulates the overarching purpose of the covenants and states in part:
 "it is the desire and intention of Developer to impose on said property mutual beneficial restrictions under a general scheme of improvement for the benefit of each and all of the separate lots."
 And . . . "all the property described . . . is held. . . . subject to the following limitations, condition, covenants and restrictions, all of which are declared and agreed to be in furtherance of a plan for the subdivision, improvements and sale of the land and are established and agreed upon for the purpose of enhancing and protecting the value, desirability and attractiveness of the land and every part thereof."
Paragraph one of the covenants establishes that the developers are the "approving authority" with respect to any building plans as well as site plans showing building location and driveways. Joseph Wisniowski testified that he and his brother adopted the covenants to maintain some control over the subdivision and to protect their investment as well as that of other lot Owners.
The crux of the plaintiffs' case against the defendants is that the placement of the house on the adjacent lot, Lot 20, was not in accordance with the plans shown them, not in accordance with the restrictive covenants, not approved by defendants as the "approving authority" and detracts from rather than enhances the value of the land and in CT Page 7888 particular their house and lot. They presented evidence that their home faces the cul-de-sac on which it is located, whereas the home on Lot 20 sits perpendicular to it and faces their home directly. Because of the small size of the lots and the location of the driveway on the far side of Lot 20, the houses are very close together and "awkward in appearance." It is this placement of the house on Lot 20, which was planned, built and then sold by the defendants, which causes the damage to their house on Lot 19.
The court notes there are three types of restrictive covenants: "(1) mutual covenants in deeds exchanged by adjoining landowners; (2) uniform covenants contained in deeds executed by the owner of property who is dividing his property into building lots under a general development scheme; and (3) covenants exacted by a grantor from his grantee presumptively or actually for the benefit and protection of his adjoining land which he retains." (Internal quotation marks omitted.) Shippan PointAssn., Inc. v. McManus, 34 Conn. App. 209, 212, 640 A.2d 1014, cert. denied, 229 Conn. 923, 642 A.2d 1215 (1994).
The court finds that in this case the restrictive covenants are uniform in nature. "With respect to . . . a [uniform] covenant, any grantee under a general or uniform development scheme may enforce the restrictions against any other grantee." (Internal quotation marks omitted.)Mannweiler v. LaFlamme, 46 Conn. App. 525, 535, 700 A.2d 57, cert. denied, 243 Conn. 934, 702 A.2d 641 (1997). "The doctrine of the enforceability of uniform restrictive covenants is of equitable origin. The equity springs from the presumption that each purchaser has paid a premium for the property in reliance on the uniform development plan being carried out. While that purchaser is bound by and observes the covenant, it would be inequitable to allow any other landowner who is also subject to the same restriction to violate it." Id., 535-36.
The court must now address the precise meaning and scope of the restrictions contained in the plaintiffs' deed. "The primary rule of interpretation of such [restrictive] covenants is to gather the intention of the parties from their words, by reading, not simply a single clauseof the agreement, but the entire context, and where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met.'" (Emphasis added, internal quotation marks and citations omitted.) Wood v. Amer,54 Conn. App. 601, 605, 736 A.2d 162 (1999).
Defendants claim, because they did not breach any specific obligation imposed on them by the fifteen specifically enumerated paragraphs, a breach could not have occurred as a matter of law. Defendants first raised this claim in connection with the court's instructions on the CT Page 7889 breach of restrictive covenants claim. The court overruled the objections at that time, finding the covenants are to be interpreted as a whole, so as not to make meaningless some of the language used. The court instructed the jury that they were to consider the covenants as a whole, and in doing so, the jury could have found from the evidence that the placement of the home on Lot 20 violated the restrictive covenants and caused the damages found.
(2) Breach of Fiduciary Duty
The defendants further claim that there was no evidence to support a finding that these restrictive covenants imposed a fiduciary duty on the defendants. "[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Internal quotation marks omitted.) Hi-Ho Tower, Inc. V. Com-Tronics, Inc., 255 Conn. 20, 38,761 A.2d 1268 (2000).
From the evidence, the jury could have found that the defendants, in particular Joseph Wisniowski, the principal participant in the development of this subdivision, as the approving authority under the restrictive covenants, were bound by its provisions to exercise their authority for the benefit of all lot owners, including the plaintiffs who had no such discretion. The defendants had the authority to control the final position of the homes and driveways on both lots. Given the superior position granted them by the restrictive covenants, the jury could have concluded there was a justifiable trust placed in the defendants, who violated that trust in the placement of the adjacent home on Lot 20 without carefully considering the placement of the home on Lot 19. Even Joseph Wisniowski admitted that the juxtaposition of the two houses on Lots 19 and 20 in the cul-de-sac was awkward.
The defendants also claim, even if there was a breach of fiduciary duty, the plaintiffs were responsible for their own loss because they themselves placed their home closer to their con-u-non lot line with Lot 20 and the cul-de-sac than was originally planned. Thus, the defendants argue the plaintiffs caused their own difficulties. However, there was evidence that the surveying and engineering company hired by the defendants to complete the site plans as well as to physically stake the locations of the houses on the lots made the final decision regarding both homes without direct consultation with the defendants. The firm also made them without directly comparing one plan to the other. The jury could have concluded that the firm was an agent of the defendants and the resulting "awkward house placement" was directly chargeable to the defendants, despite the plaintiffs' request to the engineers to move CT Page 7890 their own house forward on their lot.
(3) Evidence re Plaintiffs' Damages
For all three of plaintiffs' causes of action, the damages sought were for a reduction in the market value of the home from what it would have been, had the defendants not acted in the way that they did. The defendants claim there was no evidence to support the amount of damages awarded. From the evidence, the jury could have found that the plaintiffs spent a total of $263,796.00 on their home and that at the time they secured their financing, the bank valued their home at $245,000.00.
In addition, there was testimony from the plaintiffs' appraiser, Peter Marsele, that in his opinion the total reduction in value to the home was $60,000, with $48,000 due to the location of the dwelling. Part of his estimate was based on his opinion as to the unattractive style of the house on Lot 20, although he had no details concerning the quality of its construction. He deducted $48,000 for the location of the building and $12,000 for the style of the home next to the plaintiffs' home and the poor quality of its construction. He also testified that homes in the area had appreciated twenty and twenty-five percent since 1999, 50 he had adjusted for this increase. He did not review other sales in the subdivision, as in his opinion, such sales do not bring out the real facts of the damage caused.
The defendant's appraiser testified that there was no reduction in the value of the home. He found the subdivision consisted of small lots with sizeable houses on them. He concluded that the placement of the house on the lot next door to the plaintiffs caused no damage because the subdivision had many houses "all jammed together." In his opinion, houses in the area had appreciated ten percent since the plaintiffs' home was built. He compared this home to other sales within the subdivision, as he believed it was not appropriate to consider sales in other parts of Berlin on lots of over an acre or more, when Arbor Commons lots were generally approximately one-quarter acre. He also testified that no homes in the area had been sold for over $270.000.00. In addition, there was testimony that appropriate plants would, over time, provide more screening between the homes and privacy and mitigate whatever damages might have existed. The jury had more than adequate evidence to support a conclusion from all of the diverse testimony that the damages were $30,000.00.
And in conclusion, the jury made inconsistent economic damages findings on these three counts, finding the damages for the breach of the restrictive covenant and the breach of fiduciary duty counts to be $30,000 and the negligent misrepresentation count to be $35,000.00. CT Page 7891 Ultimately, such inconsistency is of no import since the negligent misrepresentation award was to be reduced by the comparative negligence of the plaintiffs by forty-nine percent. In addition, the plaintiffs are not entitled to three recoveries for the same injury, however one of those three recovery may be reduced. The court finds there was more than adequate evidence for the jury to conclude that the reduction in the value of the plaintiffs' residence was $30,000.00. For the foregoing reasons, the court denies the defendants' motion to set aside the verdict. The court confirms an award to the plaintiffs in the total amount of $30,000 for the reduction in the value of their residence. To the extent possible and proper under the law, the court is to interpret the jury's findings so as to sustain its verdict. Kurti v. Becker, supra, 54 Conn. App. 337.
C. The Defendants' Counterclaims
(1) The libel and slander claims and award.
Plaintiffs' first claim concerns the evidence supporting damages for libel. They claim the defendants were required to prove their losses with specificity and introduce business records concerning business income. They claim such special damages were not demonstrated as required by the law. In reviewing this claim, the court will first review the facts the jury could reasonably have found. From the evidence, the jury could have found the following:
The defendants attempted to secure planning and zoning permission for this affordable housing subdivision from the town of Berlin in the early 1990s and were denied. They took a timely appeal and after trial, the town was ordered to issue the necessary approvals. The town then appealed. and the appellate court sustained the trial court's order, which the Connecticut Supreme court declined to review. Wisniowski v. PlanningCommission, 37 Conn. App. 303, 655 A.2d 1146, cert. denied, 233 Conn. 909,658 A.2d 981 (1995). Finally the defendants secured town approval pursuant to court order in 1999 and began to advertise lots for sale. The subdivision plan ordered by the court to be approved by the town did not require the defendants to perform any improvements on Kensington Road.
The plaintiff Joseph Wisniowski testified to the many ways in which the relationship with the town officials was difficult. The jury could have concluded that contentious and hostile interactions with town officials were common and that the town resisted this development. In 1999, after the Demorais' home was built and into the summer of 2000, the plaintiffs, and in particular Sharon Desmorais, began to complain about the status of the development to town officials. She and her husband appeared at town meetings and both spoke about and presented letters CT Page 7892 signed by themselves and others complaining about the defendants and their "failure" to do required work at the subdivision. They complained of sewerage in the streets, of failure to install storm drains, grade areas, and other matters, claiming that the defendants were not building the subdivision according to the local and state requirements. There was negative publicity in the New Britain Herald concerning all these claims. The plaintiffs also raised fears of West Nile virus from misquotes claimed to be breeding in puddles in the area, even though no such evidence was ever found. The plaintiffs also circulated and then submitted a petition to the town to make changes to Kensington Road. In short, the jury could have concluded that the plaintiffs engaged in a campaign to harass and intimidate the defendants by these actions, as alleged in the counterclaim.
There was testimony by Joseph Wisniowski that the subdivision was planned, approved and bonded in stages. The storm water drainage system in the subdivision was designed by the engineers and approved by all relevant officials. Because the Desmorais were among the first purchasers in the subdivision, some of the work was not scheduled to be completed until after the subdivision was completed and that the plaintiffs knew it would more than two years. Until the finish course of paving was placed on the roads, the catch basins for the water's entry into the drainage system were above grade and therefore water collected in such areas, particularly at the lowest points in the subdivision. In addition, some water problems were caused by the fact that finish grading and seeding of lawns around houses in the construction phase could not be completed until the homes themselves were finished and the final course of paving was done. These were temporary and expected matters, which would resolve themselves as the subdivision was built out. From this and other testimony, the jury could have concluded that the written statements and the contents of the petition made by the plaintiffs contained falsehoods, which the plaintiffs either knew were not true or made with reckless disregard for the truth. They further could have concluded that the town officials were also aware of the relevant facts and the false nature of the allegations.
Joseph Wisniowski also testified that across Kensington Road on the opposite side of the subdivision lay fifty acres of open land. The drainage from that land went through a small twenty-four inch pipe under the road installed by the town, which drained all of the water from that area and "propelled" the water into the Arbor Common subdivision. During the summer of 2000, and after the petition was presented to the town by the plaintiffs, the defendants attempted to secure a certificate of occupancy for a home constructed on Lot 4-28 in the subdivision. The town denied it and stated that before it would be issued, the defendants would have to make corrections to the drainage on Kensington Road and connect CT Page 7893 it to the subdivision storm water drainage system. When pressed for an explanation, the town officials stated angrily that they could require whatever they wanted from Mr. Wisniowski. And while the defendants entered into an agreement with the town concerning this dispute, they did reserve the right to pursue their claims against the town on this issue.
Joseph Wisniowski's testimony was that the extra work the town required over his objection was done in the course of one week and a Saturday. The cost for the pipe work along Kensington Road alone was $45,000.00. In addition, he had to rent equipment and pay his men, which for all the extra work was $1000 an hour for 10 hours for five days and time and a half on Saturday. The total additional costs, he stated, were between $70,000 and $100,000.00. He stated that no concerns had been raised by town officials about the drainage on and across Kensington Road until after the plaintiffs began their campaign of harassment in earnest in the summer of 2000. The jury could have concluded that the plaintiffs' libelous and slanderous statements including their actions in preparing and circulating the petition for changes to Kensington Road, in the context of the existing relationship between the defendants and the town officials, caused the town officials to insist upon a new and additional requirement for the development of Arbor Commons not previously sought or imposed. From the evidence, the jury reasonable could have concluded that a portion of these costs, $50,000, were attributable to the plaintiffs' actions.
The jury awarded no damages for libel and slander per se, which was alleged, but did award economic damages of $50,000 for libel and slander. It also awarded no non-economic damages under this count. The court finds that under the legal standards to be applied and a litigant's right to have factual issues including damages determined by a jury, this jury award is adequately supported by the evidence and is not so excessive as to shock the conscience. ". . . [T] here is room for a reasonable difference of opinion among fair minded persons as to the amount that should be awarded." Mather v. Griffin Hospital, supra,207 Conn. 138, 139.
Plaintiffs argue that since the jury did not find libel per se, actual damages must be proven. As our appellate court noted: "While all libel was once actionable without proof of special damages, a distinction arose between "libel per se" and "libel per quod." A libel per quod is not libelous on the face of the communication, but becomes libelous in light of extrinsic facts known by the recipient of the communication. Id., 97. When a plaintiff brings an action in libel per quod, he must plead and prove actual damages in order to recover." (Citations and internal quotation marks omitted.) Battista v. United Illuminating Co.,10 Conn. App. 486, 491, 523 A.2d 1356 (1987). Plaintiffs argue the CT Page 7894 correct law. The court concludes that the jury did find actual damages based on facts reasonably supported by the evidence.
The last argument advanced by the plaintiffs is at its heart an equitable one. They claim because the jury's total award, before any reduction for multiple recoveries for one injury, provided for a net sum of money to be awarded to the plaintiffs, the court should permit the outcome of all of the jury's awards to stand. Such a conclusion comports with neither the requirements of the law, the evidence nor the equities.
For all of the foregoing reasons, the plaintiffs' motion to set aside the verdict is denied.
BY THE COURT
 ___________________ BARBARA M. QUINN, Judge